IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KELLY LEIBY, | ) | CASE NO. 5:16-cv-01285 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Kelly Leiby ("Plaintiff" or "Leiby") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I. Procedural History

Leiby protectively filed[1] her application for DIB on January 3, 2012. Tr. 14, 94, 95, 150-153. She alleged a disability onset date of April 1, 2007 (Tr. 14, 95, 150, 248), and alleged disability due to degenerative disc disease, degenerative joint disease, herniated disc, and arthritis. (Tr. 95, 107, 112, 189). After initial denial by the state agency (Tr. 107-109) and

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application." http://www.socialsecurity.gov/agency/glossary/ (last visited 4/19/2017).

denial upon reconsideration (Tr. 112-114), Leiby requested a hearing (Tr. 117-118).  A hearing was held before Administrative Law Judge Paula J. Goodrich ("ALJ") on July 23, 2014.  Tr. 28-84.

In her October 31, 2014, decision (Tr. 11-27), the ALJ determined that Leiby had not been under a disability from April 1, 2007, through March 31, 2012, the date last insured.  Tr. 14, 21.  Leiby requested review of the ALJ's decision by the Appeals Council.  Tr. 7-10.  On March 31, 2016, the Appeals Council denied Leiby's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.      Personal, educational, and vocational evidence

Leiby was born in 1962.  Tr. 150, 185.  Leiby completed the 12th grade.  Tr. 190.  At the time of the hearing, Leiby lived with her husband and their seven-year-old daughter.  Tr. 37-38.  Leiby explained that their daughter is her husband's granddaughter.  Tr. 38.  She and her husband took permanent legal custody of her when she was a baby.  Tr. 38.  Leiby's past work included work as a data entry clerk, administrative assistant, customer order clerk, checker II, and receptionist.  Tr. 21, 42-49, 71-73.

### B.      Medical evidence

#### 1.      Treatment records

On August 27, 2007, Leiby was seen at Cuyahoga Falls General Hospital with complaints of injury to her buttocks and low back.  Tr. 277-278.  Leiby reported that her problems started about two weeks prior when she was bending over to pick up a child at home.  Tr. 277.  The physical examination showed the following musculoskeletal findings:

> No signs of local contusion.  No evidence of hematoma.   Low back exam shows
> no specific areas of bony point tenderness.  There is a marked degree of lumbosacral

2

> paravertebral spasm on the right side of the low back.   Exam of the lumbosacral
> area elicits a very definite 'trigger point' that seems to reproducibly elicit the
> patient's symptoms.   There is no evidence of lower extremity weakness. Able to
> dorsiflex ankle and plantar flex with good strength. There are no specific sensory
> findings. The reflexes are approximately 2+ symmetrical including the knee and
> the Achilles.  Normal Patrick test.  Normal straight leg raise.  Exam of the low back
> shows a generalize[d] mild to moderate decrease in lumbosacral spine movement.
> There is no specific movement that is affected more than others with decrease in
> flexion and rotation equally. Has approximately 30 degrees of right rotation of the
> LS spine.  No extremity tenderness.  Full range of motion in all extremities.  No
> extremity edema.  No calf tenderness.

Tr. 278.  Leiby was diagnosed with lumbar strain.  Tr. 277.  She was discharged with

prescriptions for Flexeril, Vicodin, and Naprosyn.  Tr. 278.

As a follow up to her emergency room visit, on August 30, 2007, Leiby saw Dr. Donofrio

of Cuyahoga Falls General Hospital Primary Care and Specialty Center for her low back pain,

reporting that her pain had not resolved completely.  Tr. 283.  Leiby indicated that the Vicodin

was helping but she was almost out.  Tr. 283.  Dr. Donofrio assessed low back pain – muscle

strain and recommended rest, ice, heat and stretches; prescribed Vicodin; and advised Leiby

regarding proper lifting mechanics.  Tr. 283.

On September 6, 2007, Leiby saw Dr. Donofrio reporting that her back pain was not

improving.  Tr. 288.  Dr. Donofrio assessed low back pain – right side; recommended a lumbar

spine x-ray; and prescribed Ultracet and Naproxen.  Tr. 288.

On October 17, 2007, Leiby was seen again at Cuyahoga Falls General Hospital for

complaints of lumbar pain – right side – sharp and dull at times.  Tr. 279-280.  Leiby reported

that she had followed up with a primary care physician following her hospital visit several month

earlier but she lost the prescription for x-rays.  Tr. 279.   The following musculoskeletal findings

were made:

> No extremity tenderness. Full range of motion in all extremities. No extremity
> edema. PT HAS NO MIDLINE/ PARASPINAL LS TENDERNESS. PT HAS
> RIGHT PIRIFORMIS TTP. NEGATIVE STRAIGHT LEG RAISE B/L.

Tr. 279-280 (capitalization in original).  Leiby was discharged in stable condition with

prescriptions for Vicodin, Valium, and Lodine.  Tr. 280.

On October 22, 2007, Leiby saw Dr. Lefever of Cuyahoga Falls General Hospital

Primary Care and Specialty Center for follow up to her emergency room visit.  Tr. 284.  Leiby

had previously gone to the emergency room because she was in a lot of pain.  Tr. 284.  She

indicated she felt better with pain medication and wanted more Vicodin.  Tr. 284.  Leiby

indicated that Ultracet did not help.  Tr. 284.  Her pain started in on the right side of her low back

and went down into her right lower extremity.  Tr. 284.  Dr. Lefever assessed sciatica, low back

pain, and degenerative joint disease of the lumbar spine.  Tr. 284.  Dr. Lefever recommended

physical therapy (3 times per week for 6 weeks) and a lumbar spine MRI.  Tr. 284.  Dr. Lefever

also added Naproxen.  Tr. 284.

On November 16, 2007, Leiby saw Dr. Donofrio.  Tr. 287.  Leiby complained that she

continued to have low back pain, with the pain greater on her right than left.  Tr. 287.  She also

complained of restless leg syndrome.  Tr. 287.  On examination, Dr. Donofrio observed

tenderness in Leiby's back, right of the medial line.  Tr. 287.  MRI results were discussed.  Tr.

287.  Dr. Donofrio assessed low back pain, herniated disc and restless leg syndrome.  Tr. 287.

Dr. Donofrio recommended physical therapy (2 times per week for 6 weeks) and a prescription

for Meloxicam.  Tr. 287.

Starting in November 10, 2009, Leiby started seeing Dr. Maged Fouad, M.D., at

Comprehensive Pain Management Specialists, and continued treatment at Comprehensive Pain

Management Specialists through June 2010.  Tr. 295-332.  Leiby described her pain as shooting,

stabbing, sharp and aching.  Tr. 330.  She explained that her pain was made worse by bending, standing a long time, lifting, sitting a long time, going up and down stairs and activity.  Tr. 330. Her pain was made better by taking medication and applying cold.  Tr. 330.  During Leiby's visit on November 10, 2009, on examination, Dr. Fouad noted tenderness in the lumbar spine, decreased range of motion in the lumbar spine on lateral bending and extension.  Tr. 331. Leiby's rotation was restricted in the lumbar spine; lumbar facet loading on the right and left were positive with the right being worse than the left; straight leg raise was negative; and there was no SI tenderness and no piriformis tenderness but there was right trochanteric bursa tenderness.  Tr. 331-332.  Leiby's gait was non-antalgic; sensation and motor examinations were normal; there was no scoliosis; bicep reflexes were normal but Leiby had diminished patellar reflexes and diminished ankle jerk.  Tr. 332.  Dr. Fouad indicated that Leiby had an MRI showing lumbar spine degenerative disc disease at L4-5 and L5-S1 with disc bulge at L4-5 and a small left-sided disc protrusion, moderate to severe bilateral L4-5 facet hypertrophy with only minimal thecal sac narrowing, and moderate medial right-sided and mild medial left-sided L5-S1 neural foraminal narrowing.  Tr. 332.  Dr. Fouad prescribed Opana and Percocet and recommended lumbar epidural steroid injections and that Leiby start physical therapy.  Tr. 332.

During a subsequent visit with Dr. Fouad on December 9, 2009, Leiby reported that she was continuing to have a lot of pain even with Opana and Percocet.  Tr. 317.  The Opana helped decrease her pain level slightly but it was not lasting the full 12 hours.  Tr. 327.  Dr. Fouad noted that Leiby was scheduled for an injection that month.  Tr. 329.  Dr. Fouad continued Leiby on Opana and increased the Percocet for breakthrough pain. Tr. 329.  "[P]hysical therapy with injection" was recommended.  Tr. 329.

Leiby's first lumbar epidural steroid injection was administered on January 8, 2010.  Tr. 321.  On February 3, 2010, Leiby saw Dr. Fouad.  Tr. 318-320.  Leiby received a refill for Opana and Percocet.  Tr. 318.  She reported 50% relief from the steroid injection but her relief did not last.  Tr. 318, 319.  Dr. Fouad recommended that Leiby continue with the injections, continue with Opana and Percocet, and start physical therapy.  Tr. 310.  Dr. Fouad also encouraged Leiby to lose weight.  Tr. 320.  The second injection was administered on February 5, 2010 (Tr. 316) and the third injection was administered on February 19, 2010 (Tr. 314-315).

On March 3, 2010, Leiby saw Dr. Fouad.  Tr. 311-313.  She indicated that the pain was constant.  Tr. 311.  She wanted a refill of Percocet but wanted to stop Opana, if possible.  Tr. 311.  She was trying to lose weight and swimming.  Tr. 311.  Leiby reported getting about 30% relief from the three steroid injections.  Tr. 311.  She indicated "she's able to get out of bed now."  Tr. 311.  Leiby's physical examination continued to show abnormalities in the lumbar spine, including tenderness, decreased range of motion, restricted rotation.  Tr. 312.  Dr. Fouad continued both Opana and Percocet and recommended right lumbar facet medial branch blocks and physical therapy.  Tr. 313.

On March 31, 2010, Leiby saw Dr. Fouad for follow up and refills.  Tr. 308.  Leiby acknowledged that Opana was intended to be an extended release medication but indicated that it worked for only about an hour and a half and then it just stopped working so she wanted to change to a higher dosage or another medication.  Tr. 308.  Dr. Fouad switched Leiby from Opana to Oxycontin and continued the Percocet with an increase in the dosage.  Tr. 310.  Dr. Fouad also provided Leiby a prescription for a TENS unit.  Tr. 310.

On April 7, 2010, and April 21, 2010, lumbar facet medial branch blocks were administered.  Tr. 306-307.  On April 29, 2010, Leiby saw Dr. Fouad.  Tr. 303-305.  Leiby

reported that her low back pain radiated to the right hip and into her right lower extremity.  Tr. 303.  Leiby indicated having 50% relief from the lumbar facet blocks.  Tr. 303.  She was having increased mobility in the morning.  Tr. 303.  Leiby informed Dr. Fouad that she had not received the prescription for the TENS unit and had not heard anything about starting physical therapy.  Tr. 303.  Dr. Fouad planned to schedule Leiby for right lumbar facet radiofrequency ablation procedure (RFA).  Tr. 305.  Oxycontin and Percocet were continued but the Percocet dosage was decreased.  Tr. 305.  Leiby was provided with a prescription for a TENS unit, advised to continue with physical therapy, and encouraged to lose weight.  Tr. 305.

On May 20, 2010, Dr. Fouad performed the RFA.  Tr. 301.  Leiby reported no relief from the RFA during an appointment with Dr. Fouad a week later on May 26, 2010.  Tr. 298.  Leiby had not heard anything regarding the TENS unit.  Tr. 298.  Oxycontin and Percocet were continued and Ambien was added.  Tr. 300.

A few weeks later, on June 16, 2010, Leiby saw Dr. Fouad and reported good relief from the RFA.  Tr. 295.  She still had not received the TENS unit.  Tr. 295.  Oxycontin, Percocet and Ambien were continued.  Tr. 297.  A TENs unit and physical were still recommended.  Tr. 297.

Leiby also received medical care from Dr. Cynthia L. DiLauro, M.D., (Tr. 419-467) dating back to at least 1998 (Tr. 467).   It appears that, starting in mid-to-late 2010 (Tr. 443), Leiby was seeing Dr. DiLauro for her back pain and receiving her prescriptions for pain medication from Dr. DiLauro (Tr.  421-443).  In June 2011, Leiby was continuing to see Dr. DiLauro for her pain and being treated with pain medications.  Tr. 421.  Leiby had started warm water therapy as well.  Tr. 421.

Upon referral of Dr. DiLauro, on August 4, 2010, Leiby saw Dr. Georges Markarian, M.D., CNS Healthcare Foundation.  Tr. 338.  Leiby stated that the pain on the right side of her

low back into her hip was very severe.  Tr. 338.  She reported pain on the left as well but not as severe as on the right side.  Tr. 338.  Dr. Markarian noted that Leiby was taking a significant amount of pain medication prescribed by Dr. DiLauro. Tr. 338.  Leiby indicated that she had received injections, epidurals and facet blocks, without relief.  Tr. 338.  She indicated that she felt that her condition worsened following the RFA procedure she had and that physical therapy caused her more pain.  Tr. 338.  On physical examination, Dr. Markarian observed that Leiby was in a moderate amount of distress.  Tr. 338.  Her body position was normal; she had no atrophy and no palpable tenderness; her gait was intact but she had a slight limp; she was able to toe and heel walk; her range of motion was intact; her muscle strength was intact 4+ to 5/5 throughout; and her reflexes were 1+ throughout.  Tr. 338.  Since Leiby had not had a recent MRI and, in light of her worsening symptoms, Dr. Markarian ordered a lumbar spine MRI and flexion-extension x-rays.  Tr. 338.

The lumbar MRI, dated September 1, 2010, showed "[d]egenerative changes, greatest in lower two lumbar levels.  There is mild central canal narrowing at L4-L5.  No direct nerve root impingement is identified."  Tr. 342.  The flexion-extension lumbar x-rays, dated September 1, 2010, showed "[n]o significant disc space narrowing" and "[n]o subluxation through flexion and extension."  Tr. 343.  Dr. Markarian saw Leiby for follow up on September 1, 2010.  Tr. 337.  Leiby reported "she [was] doing well and [had] no specific complaints."  Tr. 337.  Dr. Markarian indicated that Leiby was stable neurologically.  Tr. 337.  Dr. Markarian indicated that the MRI showed "mild degenerative changes, none of which really demonstrates significant severe problems" and he was not inclined to offer surgery absent abnormalities on EMG/nerve conduction studies.  Tr. 337.  Thus, Dr. Markarian indicated that further decisions regarding a plan of care would be made following EMG/nerve conduction studies.  Tr. 337.  The EMG/nerve

8

conduction studies of Leiby's bilateral lower extremities were conducted on September 21, 2010, and were all within normal limits.  Tr. 339-341.

On October 29, 2010, Dr. Markarian saw Leiby for follow up to discuss the EMG/nerve conduction study results.  Tr. 335.  Dr. Markarian did not believe that surgery would benefit Leiby given the mild nature of the problems that she was having.  Tr. 335, 336.  In an October 29, 2010, letter to Dr. DiLauro, Dr. Markarian confirmed that he was not inclined to offer surgical treatment for Leiby.  Tr. 336.

Upon Dr. DiLauro's referral, on March 12, 2011, Leiby saw Scot Miller, D.O., of the Crystal Clinic Orthopaedic Center for an evaluation of chronic low back pain.  Tr. 475-482. Leiby described her pain as 10/10 and constant.  Tr. 475.  She further described her pain as 50% back pain and 50% bilateral posterior buttock and thigh pain.  Tr. 475.  Leiby's medications included Percocet and Oxycontin.  Tr. 475.  Dr. Miller noted physical examination findings, including that Leiby was able to walk on heels and toes; her gait was normal without list or antalgia and without myelopathic findings; her strength was 5/5 bilaterally at L3-L4, L4-L5, and L5-S1; her sensation was intact to touch at L2-S1 bilaterally; straight leg raising was negative bilaterally; lumbar motion was normal in all motion planes; she had unrestricted mobility in her hips without pain reproduction bilaterally; she had mild lumbar tenderness in the lumbosacral junction; and she had mild bilateral S1 joint tenderness.  Tr. 476.  Upon review of Leiby's x-rays and MRI scanning, Dr. Miller observed that degenerative facet disease and degenerative disc disease was noted at both L4-L5 and L5-S1 but he did not see evidence of "instability pattern." Tr. 476.  Dr. Miller noted that Leiby had not recently tried physical therapy but she was interested in trying aquatic therapy.  Tr. 476, 477.  Dr. Miller recommended blood work to see if there was an unusual cause of her pain.  Tr. 476, 477.  Dr. Miller also discussed with Leiby the

possibility of two level lumbar fusion surgery.  Tr. 476, 477.  Leiby was going to think about her

options and try aquatic therapy.  Tr. 476, 477.  Dr. Miller planned to see Leiby back in 6-8

weeks to check on her progress.  Tr. 477.

On June 2, 2011, Leiby saw David H. Williams, R.N., PA-C, of the Crystal Clinic

Orthopaedic Center.  Tr. 483.  Leiby had been undergoing aquatic therapy.  Tr. 483.  It was

"helping quite a bit and she [was] losing a fair amount of weight having lost nearly 25 pounds

since her last office visit."  Tr. 483.  Leiby was "noticing gradual decreases in her pain but still

[had] considerable back pain."  Tr. 483.  Mr. Williams noted that Dr. DiLauro was switching

Leiby from Oxycontin to Fentanyl patches.  Tr. 483.  Leiby had Percocet at home but was not

using it at that time.  Tr. 483.  She was going to try to wean down on her Oxycontin.  Tr. 483.

On physical examination, Mr. Williams observed that Leiby mobilized somewhat slowly from a

sitting to a standing posture and tended to take a few moments to stand fully erect; she had intact

lower extremity motor function throughout; her low back itself was painful in the midline at the

lumbosacral junction; her gait was essentially normal; and no obvious antalgia or list was

detected.  Tr. 483.  Mr. Williams also noted that Leiby described gradually increasing back pain

when she crossed her legs in the office exam chair.  Tr. 483.  Mr. Williams assessed

"degenerative disc disease of the lumbar spine, low back pain."  Tr. 483.  Leiby had not obtained

the previously recommended blood work so Leiby was provided with another prescription for the

lab work.  Tr. 483, 484.  Leiby was "benefiting quite a bit from physical therapy so she [was

going to] continue" with it.  Tr. 483.  Leiby indicated that she was taking care of her 4-year-old

daughter and did not want to be laid up for a long time so she wanted to avoid surgery if she

could.  Tr. 483.

Leiby attended aquatic therapy from April 20, 2011, through June 13, 2011.  Tr. 352-418.
At discharge, Leiby had made progress.  Tr. 365-366.

June 24, 2011, treatment notes from Dr. DiLauro reflect that Leiby wanted to stop using
her patch because it was making her really tired.  Tr. 532.  Leiby had used a few extra Percocets
because it gave her more energy and she wanted to know if she could get more Percocet because
it was the only thing that kept her awake.  Tr. 532.  On July 12, 2011, Leiby called Dr. DiLauro's
office indicating that her Oxycontin was not working and she was having a lot of breakthrough
pain.  Tr. 534.  She also requested a back brace to see if that would help.  Tr. 534.

Beginning on October 5, 2011, and continuing through December 30, 2011, Leiby
received chiropractic services at Monroe Falls Chiropractic.  Tr. 560-575.  Tenderness in the
spine and pelvis was noted during treatment sessions but Leiby was able to heel and toe walk
without limitation and had a normal gait.  Tr. 561-575.  Leiby continued to treat with Dr.
DiLauro throughout 2011 and in 2012.  Tr. 611-657.

On February 23, 2012, Leiby saw Richard S. Brower, M.D., of the Crystal Clinic
Orthopaedic Center for evaluation.  Tr. 665-666.  Dr. Brower noted that Leiby had seen both Dr.
Markarian and Dr. Miller.  Tr. 665.  Also, Dr. Brower indicated that Dr. DiLauro was handling
Leiby's medications, "but she [was] up to 80 mg of OxyContin 3 times a day with 15 mg.
Oxycodones in between and it [was] still not providing any relief."  Tr. 665.  Leiby had tried
physical therapy, aquatic therapy, chiropractic treatment and was taking Valium.  Tr. 665.  Dr.
Brower indicated that Leiby was smoking about a pack a day and noted that "[s]moking has also
unequivocally been shown to have a very detrimental effect on formation of spinal fusions [and]
[o]steoporosis is much more prevalent in patients that smoke than those who do not smoke."  Tr.
665.  A "Stop Smoking" pamphlet was provided to Leiby.  Tr. 665.

Dr. Brower observed that Leiby had poor range of motion in the low back.  Tr. 665.  Also, Leiby's hip motion was "a little restricted to internal rotation on both sides but not bad and [did] not seem particularly painful."  Tr. 665.  "External rotation [was] a little bit better."  Tr. 665.  Because of Leiby's chronic back pain, lumbar imaging was ordered.  Tr. 665.  Dr. Brower indicated that the lumbar films showed that Leiby had "a very degenerative disc at L5-S1, lesser so at L4-L5.  There [was] the beginnings of some calcification of the abdominal aorta . . . up around the L3 level."  Tr. 665, 667.  Dr. Brower also reviewed an MRI scan from Dr. Markarian's office from September 2010 that showed "some stenosis at the L4-L5 level with degenerative disc disease primarily at L4-L5 and L5-S1."  Tr. 665.

In his assessment and plan, Dr. Brower concluded that Leiby had chronic pain and was taking too much narcotic medication and it was not effective.  Tr. 665.  Thus, there was a narcotic addiction along with chronic pain most likely caused by degenerative disc disease but there was also a significant element of spinal stenosis at the L4-L5 level.  Tr. 665.  Dr. Brower advised that Leiby would need to stop smoking before she was even considered for surgical intervention.  Tr. 665.  Thus, he recommended that an MRI scan be performed once she had stopped smoking for a month.  Tr. 665.

On April 12, 2012, Leiby saw Dr. Miller again, indicating that she wanted to proceed with surgery.  Tr. 669-670.  Dr. Miller ordered films of Leiby's lumbar spine due to low back pain.  Tr. 668.  The films showed "degenerative lumbar disc disease with dynamic instability."  Tr. 668.  Dr. Miller's examination revealed "weakness of anterior tibialis bilaterally, as well as EHL bilaterally at 4/5.  Straight leg raising [was] bilaterally positive."  Tr. 669.  Sensory examination revealed "dullness to L5 dermatome bilaterally."  Tr. 669.  "Hip motion appear[ed]

to be adequate." Tr. 669.  "Lumbar spasm [was] noted." Tr. 669.  "Femoral stretch [was] bilaterally negative." Tr. 669.

On May 23, 2012, Dr. Miller[2] performed an anterior lumbar exposure of the L5-S1 disc space with discectomy and fusion.  Tr. 672-679.  On May 26, 2012, Leiby was discharged home with instructions to wear a brace and perform activity as tolerated.  Tr. 679.  On June 8, 2012, Leiby saw Nurse Kirkpatrick for a surgical follow-up appointment.  Tr. 681-682, 684-685.  A lumbar x-ray was taken, which showed "[h]ealing lumbar interbody fusion with stable fixation L5-S1."  Tr. 680.  In her assessment, Nurse Kirkpatrick noted that Leiby had "some residual low back pain as well as incisional pain."  Tr. 681.  Nurse Kirkpatrick advised Leiby of postoperative instructions, which included instructions to limit heavy lifting, bending, pushing and pulling.  Tr. 681.  Leiby could drive provided she was not taking pain medication.  Tr. 681.  A prescription for physical therapy was provided with instructions to start land but, not water, therapy right away.  Tr. 681.  Nurse Kirkpatrick also advised Leiby that she could wean off using the walker and start to use a cane for support.  Tr. 681.

Leiby saw Dr. Miller on July 12, 2012, for a postoperative visit.  Tr. 686.  Dr. Miller indicated that Leiby described some generalized back aching with extended activities.  Tr. 686.  Because of setbacks unrelated to her surgery, Leiby had just recently started physical therapy.  Tr. 686.  Dr. Miller indicated that Leiby should continue with her therapy; should avoid heavy lifting, bending or straining of her back; and she should follow up in about 10 weeks to reassess her condition.  Tr. 686.  Dr. Miller felt that Leiby was making good progress.  Tr. 686.  On September 25, 2012, Leiby saw a Crystal Clinic nurse for follow up.[3]  Tr. 691.  Lumbar spine

---

[2] Dr. Drazen Petrinec, M.D., also participated in the surgery along with Katie Kirkpatrick, CMP.  Tr. 672.

[3] The September 25, 2012, treatment note reflects that the provider was Kathleen Opsitnick, CNP, but the record was signed by Kathleen Kirkpatrick, MSN/CNP.  Tr. 691.

films were obtained and reviewed by Dr. Miller.  Tr. 691.  The films showed "evidence of interbody cage L5-S1 with early signs of fusion."  Tr. 691, 693.  The assessment was that Leiby was doing well.  Tr. 691.  Leiby was encouraged to continue exercises at home and advised that she could begin low impact activities at a gym as tolerated.  Tr. 691.  Leiby informed the nurse that she was in the process of applying for disability because her back issues combined with other medical conditions made her unable to work.  Tr. 691.

On March 19, 2013, Leiby saw Dr. Miller for follow up and examination of her low back. Tr. 694-695.  Leiby was continuing to take Oxycontin for pain and was in the process of weaning down from her pre-surgical levels.  Tr. 694.  Dr. DiLauro was continuing to manage Leiby's pain.  Tr. 694.  Leiby had lowered her Oxycontin from 60 mg to 30mg.  Tr. 694.  Leiby's pain was located primarily in the midline with reports of ongoing radiating pain.  Tr. 694.  However, the radiating pain seemed to be less bothersome.  Tr. 694.  Dr. Miller's examination revealed generally normal findings except Dr. Miller noted that Leiby did not have the ability to heel and toe walk; she had disability with regard to overall mobilization; and she was not able to stand or walk any significant distance.  Tr. 694-695.  Dr. Miller stated:

> I wholeheartedly agree that she is a candidate for disability application as I do not believe that with her condition, that she would be in the workforce category that would require anything other than sedentary activities, and even then, she would have a hard time finding a sitting job as she is not able to perform a lot of sitting on a prolonged basis.

Tr. 695.  Dr. Miller indicated he would see Leiby back in June or July 2013 for her final postoperative follow-up visit.  Tr. 695.  Dr. Miller indicated that the fusion at L5-S1 appeared to be consolidating.  Tr. 695, 697.  He also observed that Leiby had a degree of osteopenia that Dr. Miller recommended that Leiby see Dr. DiLauro about.   Tr. 695-696.

14

In June 2013, upon Dr. Miller's referral, a Functional Capacity Evaluation was performed by NovaCare Rehabilitation. Tr. 699-711. The evaluation was performed by a physical therapist, David Hardwick. Tr. 700. Based on his evaluation, Mr. Hardwick concluded that Leiby had the ability to function at a sedentary level. Tr. 699.

Leiby saw Dr. Miller in July 2013. Tr. 712-714. Leiby was still taking pain medication but off Oxycontin which Dr. Miller felt was a good improvement for Leiby. Tr. 713. Leiby indicated that she had returned to more normal activities. Tr. 713. She was exercising and performing daily activities with less stress and anxiety. Tr. 713. Leiby denied severe pain. Tr. 713. On examination, Dr. Miller observed some limited lumbar motion. Tr. 714. However, other examination findings were normal. Tr. 713. For example, Leiby's gait was normal; her strength was 5/5 bilaterally at L3-L4, L4-L5, and L5-S1; sensation was intact to touch at L2-S1 bilaterally; and straight leg raising was negative. Tr. 713. Dr. Miller indicated that lumbar films demonstrated "solid fusion at L5-S1with maintained lumbar alignment and fixation at the L5-S1 segment. There appears to be very good evidence of interbody healing at this lowest L5-S1 segment. No adjacent segment changes are noted proximally." Tr. 714. Absent setbacks, changes, or other issues, Dr. Miller indicated that he would see Leiby back in a year for follow up. Tr. 714. Dr. Miller relayed his observations to Dr. DiLauro. Tr. 714-715.

In December 2013, Leiby saw Daniel B. Laszlo, M.D.,[4] of Falls Family Practice, with complaints of back pain and for medication refills. Tr. 764-767. Leiby indicated that the problem was fluctuating and the symptoms were relieved by medication and rest. Tr. 764. On examination, Dr. Laszlo noted bilateral SI tenderness and lumbar spine tenderness. Tr. 766. Otherwise, the physical examination findings were normal. Tr. 766. On January 17, 2014,

---

[4] Leiby indicated that she started seeing Dr. Laszlo because Dr. DiLauro was no longer able to prescribe narcotics. Tr. 66-67.

Leiby returned to see Dr. Laszlo, reporting that she was trying to wean herself off medication but was going through withdrawal.  Tr. 768-771.  Leiby saw Dr. Laszlo again on January 31, 2014.  Tr. 772-775.  Notes from that visit indicate that Leiby had seen a pain management doctor and was following up with Dr. Laszlo regarding that meeting.  Tr. 772.  A February 7, 2014, lumbar spine MRI, ordered by Dr. Laszlo, showed the L5-S1 fusion; a disc bulge at L3-L4, resulting in minimal narrowing of the spinal canal; a right posterior paramedian disc herniation with slight caudal migration at L4-L5, impressing upon the originating right L5 nerve root.  Tr. 776.  Leiby saw Dr. Laszlo again on April 9, 2014, with reports of back pain.  Tr. 786-789.

In 2014, upon referral by Dr. DiLauro and Dr. Laszlo, Leiby was seen at Western Reserve Health System, a pain management center, for a consultation regarding her back pain.  Tr. 796-799, 802-810, 812-817.  In March 2014, Leiby was taking Oxycodone-Acetaminophen and Gabapentin and felt both were helpful with no side effects.[5]  Tr. 805.  Leiby was interested in aquatherapy.  Tr.  805.  In April 2014, changes were made to Leiby's medications.  Tr. 803.  Tramadol was to be started in place of Pecocet.  Tr. 803.  Also, Tizanidine and skin patches were prescribed.  Tr. 803.

On May 20, 2014, Leiby saw Dane J. Donich, M.D., of The Neurosurgery and Spine Group, regarding her low back pain.  Tr. 912.  Dr. Donich reviewed the February 2014 lumbar spine MRI, indicating that it showed "an interbody device at L5-S1. It is unclear if she had a solid fusion or not.  She may clinically have a nonunion."  Tr. 912.  Accordingly, Dr. Donich recommended a CT scan and flexion-extension x-rays to better assess the issue.  Tr. 912.  After the CT scan and x-rays were performed (Tr. 916-917, 918-919), on June 30, 2014, Leiby saw Dr. Donich for follow up (Tr. 913-915).  On physical examination, Leiby's gait was steady and she

---

[5] She was also taking Klonopin and Ambien.  Tr. 805.  She wanted to stop the Klonopin and did not feel the Ambien was helpful.  Tr. 805.

was able to ambulate on heels and toes; Leiby had moderate limitation in all directions; lumbar

strength was 4+/5 and straight leg raise was positive bilaterally.  Tr. 914.  Dr. Donich noted

"Fusion – non-union on CT scan" and discussed the risks and benefits of surgery with Leiby.  Tr.

914.

## 2.  Opinion evidence

### a.  Treating physicians

<u>Dr. Miller</u>

In treatment notes from March 19, 2013, Dr. Miller stated:

[Leiby] has disability with regard to mobilization.  She is not able to stand or walk any significant distance.

I wholeheartedly agree that [Leiby] is a candidate for disability application as I do not believe that with her condition, that she would be in the workforce category that would require anything other than sedentary activities, and even then, she would have a hard time finding a sitting job as she is not able to perform a lot of sitting on a prolonged basis.

Tr. 695.

<u>Dr. Donich</u>

On August 4, 2014, Dr. Donich responded to questions posed by Leiby's attorney

following the July 23, 2014, administrative hearing.  Tr. 922.  The questions and

responses are excerpted below:

1.      Your notes of 6/30/14 indicate a non-union at the surgical site where surgery was performed in May 2012.  Would you please provide your opinion with regard to when the non-union began, i.e., does it relate all the way back to the surgery or has it occurred at some point between the surgery and the present time?

"Surgery normally heals over one year but fusion did not mature as expected[.]"

2.      Your same notes indicate the necessity of surgery.  Is the surgery to correct or revise what was done in the May 2012 surgery?

"Yes[.]"

Tr. 922.

                **b.**        **State agency reviewing physicians**

On June 12, 2012, state agency reviewing physician William Bolz, M.D., completed a Physical RFC assessment for the date last insured – March 31, 2012.  Tr. 90-92.  Dr. Bolz opined that Leiby would have the following exertional limitations – lifting/carrying 20 pounds occasionally and 10 pounds frequently; standing/walking about 6 hours in an 8-hour workday; sitting about 6 hours in an 8-hour workday; and pushing/pulling unlimitedly, except as shown for lift/carry.  Tr. 91.  Dr. Bolz opined that Leiby would have the following postural limitations – occasionally climbing ramps/stairs; occasionally stooping, kneeling, crouching, and crawling; and never climbing ladders/ropes/scaffolds.  Tr. 91.  Dr. Bolz indicated that the postural limitations were due to degenerative disc disease and right hip problems.  Tr. 91-92.

Upon reconsideration, on January 9, 2013, state agency reviewing physician Bruce Mirvis, M.D., completed a Physical RFC assessment for the date last insured – March 31, 2012. Tr. 101-103.  Dr. Mirvis opined that Leiby would have the following exertional limitations – lifting/carrying 20 pounds occasionally and 10 pounds frequently; standing/walking about 6 hours in an 8-hour workday; sitting about 6 hours in an 8-hour workday; and pushing/pulling unlimitedly, except as shown for lift/carry.  Tr. 101-102.  Dr. Mirvis explained the exertional limitations, stating that Leiby "has DDD of LS mild with radicular pain right LE and mild DJD of right hip.  [Leiby] reports pain increased if sits to[o] long with discomfort from sitting to standing position."  Tr. 102.  Also, Dr. Mirvis stated "[Leiby] needs to go from sitting to standing every 30 min. to 60 min. for 6 hours in an 8-hour day.  [Leiby] has normal gait and muscular strength and neurologic exam with normal EMG in 9/2010."  Tr. 102.  Dr. Mirvis opined that Leiby would have the following postural limitations – frequently climb ramps/stairs;

frequently stoop; occasionally crawl; and occasionally climb ladders/ropes/scaffolds.  Tr. 102.

Dr. Mirvis explained the postural limitations, stating Leiby "has DDD of LS and DJD of right

hip."  Tr. 102.  Dr. Mirvis also opined that Leiby would need to avoid concentrated exposure to

hazards (machinery, heights, etc.), noting again as explanation that Leiby "has DDD of LS and

DJD of right hip."  Tr. 103.

## C.    Hearing testimony

### 1.    Plaintiff's testimony

Leiby testified and was represented at the hearing.  Tr.  36-73, 78-79, 80-82.  She

testified about her activities of daily living, medical treatment history, past employment, and

extent and nature of her pain and limitations.  Tr.  36-73, 78-79, 80-82.  Leiby drives but not very

often and only if it is close to her house because it hurts to drive.  Tr.  39. Leiby indicated that, if

she was allowed to get up and down and move around, she would only be able to sit for less than

one hour in an eight-hour day.[6]  Tr. 56-57.  Leiby also has a difficult time walking.  Tr. 58.  If

she walks to her mailbox, by the time she is coming back, her back hurts because her driveway is

on an incline.  Tr. 58.

Leiby indicated that Dr. Miller performed surgery on her back on May 23, 2012 (Tr. 40),

and Dr. Donich advised her that the surgery that Dr. Miller performed did not work and that she

needs further surgery (Tr. 56, 60, 69).  Leiby stated that she feels like the cage that Dr. Miller put

in her back in 2012 is sticking through her back.  Tr. 52-53, 55.  She said it is "horribly painful"

and "painful all the time."  Tr. 55.  She is scared to have another surgery and worried about being

laid up for a long time and not having a lot of people to help out.  Tr. 53.  Leiby's pain

medication was generally managed by her primary care physician Dr. DiLauro until December

---

[6] Leiby stated that she was having a hard time sitting during the administrative hearing and had to stand at times.  Tr.
57.

2013 when Leiby switched her primary care treatment to Dr. Laszlo.  Tr. 66-67.  At the time of the hearing, Leiby was trying to manage her pain with Percocet but it was not really working.  Tr. 67.  She stated she needed to have another surgery.  Tr. 67.  When asked if she felt her condition was worse now or before her surgery in 2012, Leiby stated she was really bad prior to the surgery but she felt she was worse now.  Tr. 58.  She indicated that she was on different and stronger medication in 2012 than now.  Tr. 58.

### 2.     Vocational expert's testimony

Vocational Expert Dr. Robert A. Mosley ("VE") testified at the hearing.  Tr. 69-83.  The VE described Leiby's past work to include work as a data entry clerk, a semi-skilled, sedentary position; an administrative assistant, a skilled, sedentary position; customer order clerk, a semi-skilled, sedentary position; checker II, a semi-skilled, sedentary position; and receptionist, a semi-skilled, sedentary position.  Tr. 71-73, 262.  The ALJ asked the VE a number of hypotheticals (Tr. 73-76), including a hypothetical limiting the described individual to work at the sedentary level with limited pushing/pulling to the extent lifting and carrying are limited; occasional climbing ramps and stairs; occasional balancing, stooping, kneeling, crouching, crawling; never climbing ladders, ropes or scaffolds; and should avoid concentrated exposure to hazards such as hazardous machinery and unprotected heights ("fourth hypothetical") (Tr. 76-77).  The VE indicated that the individual described in the fourth hypothetical would be able to perform Leiby's past work.  Tr. 77.  In response to questioning from Leiby's counsel, the VE indicated that, if there was a sit/stand option at will in the ALJ's fourth hypothetical, the described individual would be able to do the clerical positions, i.e., the administrative assistant, customer order clerk, receptionist, and checker positions.  Tr. 82-83.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is

capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her October 31, 2014, decision, the ALJ made the following findings:[7]

1.  Leiby met the insured status requirements through March 31, 2012.  Tr. 16.

2.  Leiby did not engage in substantial gainful activity during the period from her alleged onset date of April 1, 2007, through her date last insured of March 31, 2012.  Tr. 16.

3.  Through the date last insured, Leiby had the following severe impairments: multi-level lumbar degenerative disc disease with non-union post fusion with radiculopathy and lumbosacral spondylosis; neuritis; and osteopenia. Tr. 16-17.

4.  Through the date last insured, Leiby did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 17-18.

5.  Through the date last insured, Leiby had the RFC to perform sedentary work except she can occasionally climb ramps and stairs, and occasionally balance, stoop, kneel, crouch, or crawl.  Leiby can never climb ladders, ropes, or scaffolds, and must avoid all exposure to hazards such as machinery and unprotected heights.  Tr. 18-21.

6.  Through the date last insured, Leiby was capable of performing past relevant work as a data entry clerk, administrative assistant, customer order clerk, checker II, and receptionist.  Tr. 21.

---

[7] The ALJ's findings are summarized.

Based on the foregoing, the ALJ determined that Leiby was not under a disability at any time form April 1, 2007, the alleged onset date, through March 31, 2012, the date last insured. Tr. 21.

## V. Parties' Arguments

Leiby argues that the ALJ erred by not properly evaluating the opinions of her treating physicians – Dr. Miller and Dr. Donich.  Doc. 12, pp. 7-10, Doc. 15.

In response, the Commissioner argues that the opinions that Leiby contends the ALJ failed to properly consider were rendered one and two years after Leiby's date last insured and those opinions do not relate back to her condition as of her date last insured.  Doc. 14, pp. 1, 10-14.

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

23

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**B.      Establishing disability in a DIB claim**

Leiby's claim is a DIB claim.  Unlike Supplemental Security Income ("SSI") benefits, to receive DIB benefits, a claimant must show that her disability started on or before her date last insured.  20 C.F.R. §§ 404.101(a); 404.131(a); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990) ("In order to establish entitlement to disability insurance benefits, an individual must establish that he became 'disabled' prior to the expiration of his insured status."); *Dettloff v. Sec'y of Health & Human Servs.*, 16 F.3d 1219, * 1 (6th Cir. 1993) (unpublished) (in order to show an entitlement to benefits, burden was on claimant to prove disability prior to date last insured).

It is undisputed that Leiby's date last insured is March 31, 2012.  Doc. 12, p. 1; Doc. 14, p. 1; Tr. 14, 16, 85.  Thus, in order to demonstrate entitlement to DIB benefits, Leiby must show that that her disability started on or before March 31, 2012.

**C.      The ALJ  properly considered Dr. Miller's March 19, 2013, opinion**

Leiby contends that the ALJ erred by not properly evaluating the March 19, 2013, opinion of her treating physician Dr. Miller.   Doc. 12, pp. 7-9, Doc. 15, pp. 1-3.  She argues that the ALJ's reasons for assigning "other weight" to Dr. Miller's opinion were not good reasons as required by the treating physician rule.  Doc. 12, pp. 7-9, Doc. 15, pp. 1-3.

24

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).  An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

In making a determination regarding Leiby's disability claim, the ALJ considered evidence regarding Leiby's back problems, including her eventual surgical fusion of the L5-S1, which occurred on May 23, 2012, after Leiby's date last insured.  Tr. 18-20, 672-679. Additionally, the ALJ considered Dr. Miller's March 19, 2013, opinion, which post-dated

Leiby's date last insured by almost a year.  Tr. 20.  In considering Dr. Miller's opinion, the ALJ

stated:

> The undersigned would note that on March 19, 2013, Dr. Miller opined that the claimant was a "candidate for disability", and "I do not believe that with her condition, that she would be in the workforce category that would require anything other than sedentary activities, and even then, she would have a hard time finding a sitting job as she is not able to perform a lot of sitting on a prolonged basis" (15F/34). The undersigned interprets this to mean that Dr. Miller believes that the claimant could not perform a range of sedentary work. This opinion was given one year after the claimant's date last insured. However, given the degenerative nature of the claimant's disc disease, it is presumed that he believed the claimant had at least this level of functioning, if not less, prior to her fusion surgery. Consequently, the undersigned gives other weight to the opinion of Dr. Miller, since it was given outside of the relevant period and is tantamount to a disability opinion, a matter reserved to the Commissioner for determination.

Tr. 21.

"Evidence of disability obtained after the expiration of insured status is generally of little

probative value." *Strong v. Soc. Sec. Admin.*, 88 Fed. Appx. 841, 845 (6th Cir. 2004) (citing

*Cornett v. Sec'y of Health & Human Servs.*, 869 F.2d 260, 264, n. 6 (6th Cir, 1988)); *see also*

*Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987)(finding evidence

obtained after date last insured only minimally probative of claimant's condition prior to date last

insured and rejecting claimant's argument that the ALJ's rejection of medical opinion was not

supported by substantial evidence).  Further, medical evidence after the date last insured is

relevant only when the evidence "relates back" to the claimant's limitations prior to the date last

insured.  *Walton v. Astrue*, 773 F.Supp.2d 742, 750 (N.D. Ohio 2011) (citation omitted)

(sentence six remand analysis); *see also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (later

dated medical evidence is to be considered to the extent it sheds light on claimant's condition

during the operative time period) ; *Jones v. Comm'r of Soc. Sec.*, 121 F.3d 708, * 1 (6th Cir.

1997) (unpublished) ("Evidence relating to a later time period is only minimally probative, and is

only considered to the extent it illuminates a claimant's health before the expiration of his or her insured status.") (internal citations omitted).

Accordingly, considering the limited probative value of evidence obtained after a claimant's date last insured, Leiby cannot demonstrate that it was error for the ALJ to take into account the fact that Dr. Miller's opinion was rendered a year after Leiby's date last insured when assessing the weight to provide to that opinion.   Further, to the extent that Dr. Miller's opinion in fact illuminates Leiby's condition prior to her date last insured, the ALJ considered the opinion and assigned weight to the opinion.

Moreover, there are certain issues that are reserved to the Commissioner for determination.  For example, opinions that a claimant is disabled or an opinion as to a claimant's RFC are issues ultimately reserved to the Commissioner.  20 C.F.R. § 404.1527(d).  Although treating source opinions on issues reserved to the Commissioner may not be ignored, such opinions are never entitled to controlling weight.  *See* SSR 96–5p, 1996 WL 374183, * 2-3 (July 2, 1996); *see also Johnson v. Comm'r of Soc. Sec.*, 535 Fed. Appx. 498, 505 (6th Cir. 2013) (unpublished) ("If the treating physician . . . submits an opinion on an issue reserved to the Commissioner – such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors – [the ALJ's] . . . decision need only explain the consideration given to the treating source's opinion." ) (internal quotations and citations omitted); *see also Grider v. Comm'r of Soc. Sec.,* 2011 WL 1114314, * 4 (S.D. Ohio Mar. 25, 2011) (recognizing that a physician's "'sedentary' assessment was a conclusion on an issue reserved to the Commissioner").

Here, Dr. Miller opined that Leiby was disabled, i.e., a "candidate for disability" and offered an opinion regarding her RFC, i.e., that Leiby had the RFC to perform less than

sedentary work.   Tr. 695.  The ALJ properly concluded that Dr. Miller rendered opinions on

issues reserved to the Commissioner and explained the consideration given to Dr. Miller's

opinion.

The ALJ's explanation of her consideration of Dr. Miller's March 19, 2013, opinion is

sufficiently clear to allow for review by this Court.  Further, considering medical evidence

obtained during the period prior to the date last insured, which the ALJ detailed in her opinion

(Tr. 19-20), Leiby has not demonstrated that the ALJ's decision to provide "other weight" to Dr.

Miller's opinion, which amounts to an opinion on an issue reserved to the Commissioner, is not

supported by substantial evidence.  Additionally, Leiby has not demonstrated that the ALJ's

determination that, prior to her date last insured, Leiby retained the RFC to perform sedentary

work – not less than sedentary as Dr. Miller opined – with postural and environmental limitations

is not supported by substantial evidence.

For the foregoing reasons, the the undersigned recommends that the Court find no error

with respect to the ALJ's treatment of Dr. Miller's March 19, 2013, opinion.

**D.     Reversal is not warranted based on the ALJ's lack of discussion of Dr. Donich's
       August 4, 2014, statements/opinions**

Leiby also argues that the ALJ erred because she is obligated to weigh all medical

opinions presented but ignored Dr. Donich's August 4, 2014, statements/opinions.  Doc. 12, pp.

9-10, Doc. 15, p. 3.

Leiby first saw Dr. Donich on May 20, 2014, well after her date last insured.  Tr. 912-

919.  On June 30, 2014, Dr. Donich indicated that a CT scan showed non-union of her prior

fusion and risks and benefits of surgery were discussed.  Tr. 914.  During the July 23, 2014,

administrative hearing, Leiby's recent treatment with Dr. Donich was discussed, including Dr.

Donich's opinion that the surgery performed by Dr. Miller was not successful because there was

28

a non-union and that Dr. Donich was recommending further surgery.  Tr.  31-34, 52-53, 56.

During the hearing, the ALJ provided Leiby and her counsel an opportunity to obtain additional

evidence to relate the non-union back to Leiby's date last insured.  Tr. 33-34.  In an attempt to

relate Dr. Donich's findings back to Leiby's date last insured, following the hearing, Leiby's

counsel submitted two questions to Dr. Donich.  Tr. 922.  The questions posed and Dr. Donich's

August 4, 2014, responses are as follows:

> 1.      Your notes of 6/30/14 indicate a non-union at the surgical site where surgery
> was performed in May 2012.  Would you please provide your opinion with regard
> to when the non-union began, i.e., does it relate all the way back to the surgery or
> has it occurred at some point between the surgery and the present time?
>
> "Surgery normally heals over one year but fusion did not mature as expected[.]"
>
> 2.      Your same notes indicate the necessity of surgery.  Is the surgery to correct
> or revise what was done in the May 2012 surgery?
>
> "Yes[.]"

Tr. 922.

The foregoing questions and responses were sent to the ALJ on August 5, 2014 (Tr. 920),

and included in the administrative record as Exhibit 22F (Tr. 27, 920-923).

Leiby claims that the ALJ erred because she did not discuss Dr. Donich's August 4, 2014,

responses in her decision.  However, as acknowledged by Leiby, Dr. Donich's

statements/opinions do not set or quantify limitations caused by Leiby's condition.  Doc. 12, p. 9.

Moreover, as discussed above in connection with Dr. Miller's opinion, evidence post-dating a

claimant's date last insured is generally of little probative value and considered only to the extent

it sheds light on a claimant's condition prior to the date last insured.  *See e.g.,  Higgs*, 880 F.2d at

863; *Walton*, 773 F.Supp.2d at 750; *Jones*, 121 F.3d 708.   Here, Dr. Donich was asked to relate

his opinion about non-union back to the time of Leiby's May 2012 surgery – a surgery that

occurred after Leiby's date last insured – but his response did not do so.  Tr. 922.  Dr. Donich's response to the question about relation-back was limited to his opinion about normal surgical healing time and Leiby's fusion not maturing as expected.  Tr. 922.  Thus, since Dr. Donich's statements/opinions did not set or quantify limitations caused by Leiby's condition and did not relate back to Leiby's date last insured, it was not error for the ALJ not to discuss them.

Additionally, at the time of the hearing, the ALJ discussed and Leiby was questioned about her treatment with Dr. Donich, including Dr. Donich's opinion that Dr. Miller's surgery was not a success because of non-union and Dr. Donich's recommendation that surgery would be required to correct the prior surgery.  Tr.  31-34, 52-53, 56.  Dr. Donich's August 4, 2014, statements/opinions are cumulative of this evidence.  Thus, Leiby's claim that the ALJ ignored evidence regarding Dr. Donich's opinions is without merit.

Accordingly, for the foregoing reasons, the undersigned recommends that the Court find that the ALJ did not err by not discussing Dr. Donich's August 4, 2014, statements/opinions in her decision.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

April 19, 2017

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the

30

right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).